Miguel FIGUEROA, Plaintiff,

v.

The UNITED STATES, Defendant.

No. 01–457C.

United States Court of Federal Claims.

Aug. 15, 2003.

Heath W. Hoglund, San Juan, Puerto Rico, attorney of record for plaintiff and Robert H. Rines, Concord, New Hampshire. Samuel F. Pamias–Portalatin, of counsel.

Brian Akira Mizoguchi, Department of Justice, Washington, D.C., with whom was Assistant Attorney General Robert D. McCallum, Jr., for defendant. David M. Cohen, Director.

Sean P. Kelly, U.S. Patent & Trademark Office, of counsel.

## OPINION and ORDER

FUTEY, Judge.

This case concerning the payment and allocation of patent fees is before the court on defendant's motion to dismiss for lack of subject matter jurisdiction or, in the alternative, for failure to state a claim upon which relief can be granted. Defendant maintains that the court lacks jurisdiction over plaintiff's Patents and Copyrights Clause [1] (Patent Clause) claim because: (1) the phrase "[t]o promote the Progress of ... useful Arts" is not a substantive limit on Congress' power; (2) the Patent Clause "does not in any way confer a substantive right on any individual;" [2] and (3) the Patent Clause cannot be interpreted as money-mandating. Defendant also contends that plaintiff's Capitation or Direct Tax Clause [3] (Direct Tax Clause) claim should be dismissed because it does not mandate the payment of money. In addition, defendant avers that plaintiff's takings claim

should be dismissed because unauthorized actions cannot form the basis of a takings claim, and plaintiff did not properly plead this claim in the alternative. Defendant also raises several standing arguments.

Relying heavily on *Longshore v. United States*, 77 F.3d 440 (Fed.Cir.), *cert. denied*, 519 U.S. 808, 117 S.Ct. 52, 136 L.Ed.2d 15 (1996), defendant maintains that plaintiff has failed to state a claim upon which relief may be granted.[4] As to plaintiff's Patent Clause claim, defendant reiterates many of the arguments it contended warranted dismissal on jurisdictional grounds. Defendant also asserts that the Patent Clause does not limit Congress' authority to set patent fees. Further, defendant avers that plaintiff's takings claim should be dismissed for failure to state a claim because "the Takings Clause does not apply to legislation requiring the payment of money," [5] and the patent fees are not held in trust on plaintiff's behalf. Defendant also advances two arguments that it purports dispose of both plaintiff's takings claim and Direct Tax Clause claim: (1) the patent fees are a condition to obtaining the privilege of a patent; and (2) there is no preexisting property interest independent of satisfying statutorily imposed conditions.

### Factual Background

The United States Patent and Trademark Office (PTO), is responsible, *inter alia*, for examining patent applications and administering patents. The PTO is authorized to grant the protection of a patent when an applicant satisfies statutorily imposed tests and conditions, including the payment of appropriate fees. Throughout the life of the patent, the PTO also requires that patent holders periodically pay a maintenance fee.[6]

Pursuant to the Omnibus Budget Reconciliation Act of 1990 (OBRA 1990), Congress legislated increased surcharges to the fees

---

1. U.S. Const. art. I, § 8, cl. 8.

2. Defendant's Motion To Dismiss (Def.'s Mot. to Dismiss) at 23–24 (citing *Tape Indus. Ass'n of Am. v. Younger*, 316 F.Supp. 340, 346 (C.D.Cal. 1970)).

3. U.S. Const. art. I, § 9, cl. 4.

4. Pursuant to the court's order of December 11, 2001, the issue of class certification was deferred until further order of the court.

5. Def.'s Mot. to Dismiss at 38 (citing *Commonwealth Edison Co. v. United States*, 271 F.3d 1327, 1329 (Fed.Cir.2001)).

6. 37 C.F.R. §§ 1.20(e)-(i) (2003).

charged by the PTO to patent applicants and holders.[7] These surcharges remained in effect until the conclusion of fiscal year 1998. In the United States Patent and Trademark Office Reauthorization Act of 1999,[8] Congress discontinued the surcharges, but enacted increased patent fees approximately equivalent to the previous patent fees plus the surcharge. As a result of the patent fee increases, the PTO generated an annual surplus of funds. Plaintiff's complaint, in part, challenges the increased level at which the patent fees were set.

Plaintiff also challenges what it terms the "diversion" of patent fees. Beginning in fiscal year 1992, a gradually increasing amount of patent fees collected in one fiscal year were not appropriated for the PTO's use in the same fiscal year.[9] Plaintiff maintains that Congress withholds appropriating funds to the PTO in a given fiscal year in order to be able to spend an amount equivalent to that not appropriated to the PTO on unrelated government programs. Conversely, defendant avers that Congress has simply decided not to appropriate every dollar available to the PTO in the same year that it was collected. Defendant also contends that "all surcharges collected by the [PTO in a given fiscal year] ... shall be credited to a separate account established in the Treasury and ascribed to the [PTO] activities in the Department of Commerce as offsetting receipts."[10] Further, defendant asserts that the surcharges are either made immediately available to the PTO or subsequently allocated through appropriation acts,[11] and "shall remain available until expended."[12] Plaintiff avers that once the funds, or their equiv-

alent, have been spent elsewhere, they are no longer available to the PTO. Specifically, plaintiff maintains that "[a]lthough a paper balance sheet credit may remain, it only awaits a formal rescission ...."[13] According to plaintiff, the authority to spend the funds was exhausted during annual appropriations, and the funds are, therefore, no longer available to the PTO because they have been "diverted" to unrelated government programs.

Lastly, plaintiff challenges the rescission of patent fees from the PTO's balance. Plaintiff directs the court's attention to the Omnibus Consolidated and Emergency Supplemental Appropriations Act of 1999, which provides "[o]f the unobligated balances available under this heading from prior year appropriations, fees collected in this fiscal year, and balances of prior year fees, $71,000,000 are rescinded."[14] Defendant concedes that rescissions have occurred.[15] Defendant maintains, however, that a rescission provides no authority for another agency to spend the funds and such authority only derives from an appropriation. Defendant also argues that the rescissions constitute "an immaterial fraction" and a *"de minimus* amount."[16] Further, defendant contends that there has been "no net rescission" because the amount rescinded has been offset by congressional funding of PTO obligations from the general Treasury. On the other hand, plaintiff argues that the "rescinded patent fees are no longer credited to the [PTO's] account and are no longer available to be appropriated to the [PTO]."[17] In sum, plaintiff asserts that the "increases, diversions, and rescissions" of patent fees exceeded Congress' authority un-

7. *Omnibus Budget Reconciliation Act of 1990,* Pub.L. No. 101–508, § 10101 *reprinted in* 1990 U.S.C.C.A.N. (104 Stat.) 1388–91 (1990).

8. *United States Patent and Trademark Office Reauthorization Act of 1999,* Pub.L. No. 105–358, 112 Stat. 3272 (1998).

9. Plaintiff's First Amended Complaint (Amended Compl.) ¶ 25; Plaintiff's Opposition To Defendant's Motion To Dismiss (Pl.'s Opp'n) at 6.

10. OBRA 1990 § 10101(b)(1)-(3).

11. *Id.*

12. *Id.* § 10101(c).

13. Plaintiff's Reply To Defendant's Reply To Plaintiff's Opposition To Defendant's Motion to Dismiss (Pl.'s Reply) at 7.

14. *Omnibus Consolidated and Emergency Supplemental Appropriations Act of 1999,* Pub.L. No. 105–277, 112 Stat. 2861 (1998).

15. Defendant's Reply To Plaintiff's Opposition To Defendant's Motion To Dismiss (Def.'s Reply) at 6 & n. 4.

16. *Id.* at 6.

17. Pl.'s Opp'n at 3.

der the Patent Clause and the Direct Tax Clause, and constitute an uncompensated taking in violation of the Fifth Amendment of the United States Constitution.

On November 14, 2002, the court held oral argument on defendant's motion to dismiss. In a bench ruling issued that day, the substance of which was reiterated in an order issued on November 15, 2002, the court stayed the proceedings in this case in anticipation of the United States Supreme Court's (Supreme Court) decision in *Eldred v. Ashcroft*, 537 U.S. 186, 123 S.Ct. 769, 154 L.Ed.2d 683 (2003), *reh'g denied*, — U.S. ——, 123 S.Ct. 1505, 155 L.Ed.2d 243 (2003). On January 15, 2003, the Supreme Court issued its opinion. Following the submission of a joint status report, the stay was lifted on March 19, 2003, and the parties submitted their briefs addressing the impact of *Eldred* on April 30, 2003. All pertinent documents have been submitted, and the case is, therefore, ready for disposition.

*Discussion*

I. Subject Matter Jurisdiction

In ruling on a motion to dismiss for lack of jurisdiction under RCFC 12(b)(1), the court must accept as true the complaint's undisputed factual allegations and construe the facts in the light most favorable to plaintiff. *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); see also *Hamlet v. United States*, 873 F.2d 1414, 1416 (Fed.Cir.1989); *Farmers Grain Co. of Esmond v. United States*, 29 Fed.Cl. 684, 686 (1993). A plaintiff must make only a *prima facie* showing of jurisdictional facts through the submitted material in order to defeat a motion to dismiss. *Raymark Indus., Inc. v. United States*, 15 Cl.Ct. 334, 338 (1988) (citing *Data Disc, Inc. v. Sys. Tech. Assocs., Inc.*, 557 F.2d 1280, 1285 (9th Cir.1977)). If the undisputed facts reveal any possible basis on which the non-moving party might prevail, the court must deny the motion. *Scheuer*, 416 U.S. at 236, 94 S.Ct. 1683; see also *Lewis*

*v. United States*, 32 Fed.Cl. 59, 62 (1994). If, however, the motion challenges the truth of the jurisdictional facts alleged in the complaint, the court may consider relevant evidence in order to resolve the factual dispute. *Rocovich v. United States*, 933 F.2d 991, 994 (Fed.Cir.1991); see also *Lewis*, 32 Fed.Cl. at 62.

It is well-settled that this court is one of specific and defined jurisdiction. The court's jurisdiction, if any, over plaintiff's claims rests on the Tucker Act, which provides that the "Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded [ ] upon the Constitution, or any Act of Congress ...." 28 U.S.C. § 1491(a)(1). The Tucker Act, however, does not itself create "any substantive right enforceable against the United States for money damages." *United States v. Testan*, 424 U.S. 392, 398, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976); see also *United States v. Mitchell*, 445 U.S. 535, 538, 100 S.Ct. 1349, 63 L.Ed.2d 607 (1980). The entitlement to money damages for defendant's alleged violation, therefore, "depends upon whether any federal statute 'can fairly be interpreted as mandating compensation by the Federal Government for the damage sustained.'" *Testan*, 424 U.S. at 400, 96 S.Ct. 948 (quoting *Eastport S.S. Corp. v. United States*, 178 Ct.Cl. 599, 607, 372 F.2d 1002 (1967)). Where a plaintiff, however, seeks the return of money paid over to the government, "[a] claim [need only] assert that the value sued for was improperly paid, exacted, or taken from the claimant in contravention of the Constitution, a statute, or a regulation." *Eastport*, 178 Ct.Cl. at 605, 372 F.2d 1002 (footnote omitted). Further, "[m]onetary claims which cannot be brought within these limits are beyond the court's jurisdiction, even though they may intimately involve the Constitution, an Act of Congress or an executive regulation." *Id.* at 607, 372 F.2d 1002 (footnote omitted).[18]

18. Plaintiff mistakenly asserts that his "selection of this forum to hear [his] claims deserves great deference." Pl.'s Opp'n at 13; see also Transcript of Oral Argument (Tr.) at 40. While a plaintiff's invocation of this court's jurisdiction will be duly considered, subject matter jurisdiction cannot be waived, *United States v. Cotton*, 535 U.S. 625, 122 S.Ct. 1781, 1785, 152 L.Ed.2d 860 (2002), and contrary to plaintiff's assertion, its selection of this forum is not afforded "great deference."

## A. *Statute of Limitations*

■ The threshold question the court must resolve is whether plaintiff's claims fall within the six-year statute of limitations. Defendant asserts that any claims concerning the payment or diversion of patent fees, which occurred prior to August 8, 1995, are barred by the statute of limitations. In an attempt to overcome the six-year jurisdictional hurdle, plaintiff maintains that the rescission of $71 million in 1999 included patent fees which were diverted prior to 1995. Plaintiff, therefore, concludes that the statute of limitations began to run when the fees were rescinded in 1999.

Actions brought under the Tucker Act are time-barred if they are not filed within six years of the date the causes of action accrued. 28 U.S.C. § 2501 (1994); see also *Japanese War Notes Claimants Ass'n v. United States*, 178 Ct.Cl. 630, 632, 373 F.2d 356 (1967). The court's six-year statute of limitations is a jurisdictional requirement, which must be strictly construed. *Cmty. Bank & Trust v. United States*, 54 Fed.Cl. 352, 355 (2002); see also *Bear Claw Tribe, Inc. v. United States*, 36 Fed.Cl. 181, 187 (1996) (citing *Hopland Band of Pomo Indians v. United States*, 855 F.2d 1573, 1577 (Fed.Cir.1988)). A statute of limitations defense is an affirmative defense and must be pled. RCFC 8(c). The plaintiff, however, bears the burden of proving by a preponderance of the evidence that its action was timely filed. *Mason v. United States*, 27 Fed.Cl. 832, 836 (1993). The court may not waive the statute of limitations. *Laughlin v. United States*, 22 Cl.Ct. 85, 99 (1990), *aff'd mem.*, 975 F.2d 869 (Fed.Cir.1992). In sum, a plaintiff's failure to comply with the statute of limitations "places the claim beyond the court's power to hear and decide." *Catellus Dev. Corp. v. United States*, 31 Fed.Cl. 399, 404 (1994).

Plaintiff's payment of allegedly excessive patent fees and Congress' diversion of patent fees, prior to August 8, 1995, in and of itself would be barred by the six-year statute of limitations. See 28 U.S.C. § 2501. According to plaintiff, however, the 1999 rescission included fees which were diverted beginning in fiscal year 1992.[19] The text of the 1999 rescission does indeed indicate that a portion of the rescinded funds were "balances of prior year[s] ...."[20] The text does not, however, enumerate the fiscal years from which the balances were taken. The question, therefore, boils down to whether plaintiff bears the burden of demonstrating that the cause of action accrued within the statutory period, or whether defendant must show that plaintiff's claim is barred. The case law is clear, the burden in on plaintiff to establish that patent fees from fiscal years 1991 to 1995 were rescinded in 1999. *Catellus*, 31 Fed.Cl. at 404 ("[P]laintiff bears the burden of proving jurisdiction when the question of jurisdiction has been raised in the context of a dispositive motion."); *Mason*, 27 Fed.Cl. at 836 ("The conclusion is ineluctable that since the defense is jurisdictional plaintiffs bear the burden of proof at trial."). While plaintiff contends that patent fees have been diverted since fiscal year 1992, plaintiff has not established by a preponderance of the evidence that the 1999 rescission included any patent fees from fiscal years prior to 1995. *Mason*, 27 Fed.Cl. at 836. All claims prior to August 8, 1995, are, therefore, barred by the statute of limitations.

## B. *Standing*

In order to establish standing, plaintiff must satisfy three elements:

First, the plaintiff must have suffered an "injury in fact" an invasion of a legally protected interest which is (a) concrete and particularized, and (b) "actual or imminent, not 'conjectural' or 'hypothetical.'" Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be "fairly ... trace[able] to the challenged action of the defendant, and not ... th[e] result [of] the independent action of some third party not before the court." Third, it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision."

---

**19.** Pl.'s Opp'n at 6.

**20.** Pub.L. No. 105–277, 112 Stat. 2861.

*Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (citations omitted); see also *Paradise Creations, Inc. v. UV Sales, Inc.,* 315 F.3d 1304, 1308 (Fed.Cir.2003). Defendant, relying on *Longshore,* contends that plaintiff lacks standing "to sue to compel a court to second guess or otherwise interfere with Congress' legislative management of its creation." [21] Defendant misreads the *Longshore* decision. Although the United States Court of Appeals for the Federal Circuit (Federal Circuit) ultimately concluded that in the absence of an allegation of a constitutional breach the courts should not intrude upon Congress' legislative thought process, the Federal Circuit did not address the issue of standing in *Longshore.* Rather, the Federal Circuit dismissed the plaintiff's causes of action for failure to state a claim upon which relief can be granted. *Longshore,* 77 F.3d at 444–45. On the other hand, it is clear in this case that plaintiff has pled an actual economic injury which can fairly be traced to Congress' actions and can be redressed by a decision that Congress exceeded its constitutional authority.

### i. Small–Entity Fee Subsidy

■ Defendant asserts that plaintiff could not have contributed to any surplus or have any of its fees diverted because plaintiff received a fifty percent small-entity subsidy. Plaintiff maintains that OBRA 1990 increased small-entity fees and that the diversion of fees encompassed both large-entity fees and small-entity fees. Plaintiff also contends that it paid large-entity rates.

There is nothing to indicate that small-entity patent fees were deposited in a separate fund from that of large-entities. Rather, "*all* patent fees paid to the Director and all appropriations for defraying costs of the activities of the [PTO] will be credited to the [PTO] Appropriation Account in the Treasury of the United States." 35 U.S.C.

§ 42(b) (emphasis added). The court, therefore, rejects defendant's argument that plaintiff lacked standing because it received a small-entity subsidy.

### ii. Payment of Fees

■ Defendant contends that anyone who has not paid patent fees lacks standing. In particular, defendant asserts that Peter Theis (Theis), an individual identified in plaintiff's First Notice Of Additional Plaintiffs,[22] has not paid any patent fees because he licensed each of his patents to third parties that are responsible for paying the patent fees. Plaintiff maintains that Theis remains the real party in interest and is a necessary party to this action. Defendant avers that an inventor is only a necessary party in a patent infringement action.

Plaintiff cites two cases in support of his position, *Prima Tek II, LLC v. A–Roo Co.,* 222 F.3d 1372 (Fed.Cir.2000), *Chou v. Univ. of Chicago,* 254 F.3d 1347 (Fed.Cir.2001), and a provision of the Code of Federal Regulations (CFR), 37 C.F.R. § 10.6. Plaintiff's CFR citation does not support its argument; § 10.6 provides that attorneys, agents, or foreigners can represent another before the PTO, but makes no mention of the payment of fees or assignments. The cases that plaintiff cites to likewise are inapposite. *Prima Tek II* was a patent infringement case brought under 35 U.S.C. § 281. Although the general rule is that a patent owner should be joined in a patent infringement case, the patent owner need not be joined where the transfer amounted to an assignment. *Prima Tek II,* 222 F.3d at 1377 (citing *Ortho Pharm. Corp. v. Genetics Inst., Inc.,* 52 F.3d 1026, 1030 (Fed.Cir.1995)). Plaintiff's First Notice Of Additional Plaintiffs indicates that Theis' patents were assigned to Illinois Technology Transfer, LLC,[23] and Theis, therefore, would not auto-

---

21. Def.'s Mot. to Dismiss at 12.

22. Although the court has not yet ruled on plaintiff's First Notice of Additional Plaintiffs, the court nevertheless addresses the standing issue as it pertains to individuals or entities that have not paid patent fees.

23. Plaintiff's First Notice Of Additional Plaintiffs ¶¶ 36–37 (indicating that Illinois Technology Transfer, LLC, "is the assignee and present owner of all of ... Theis' patents"); see also Tr. at 43–44, 87–88 ("[I]t is technically true that Illinois Technology Transfer is the owner of those patents ....").

matically have been a necessary or indispensable party in the litigation.

On the other hand, *Chou* was a suit for correction of inventorship under 35 U.S.C. § 256. The question presented in *Chou* was whether "a putative inventor who is obligated to assign her invention to another is entitled to sue for correction of inventorship under § 256 ...." *Chou*, 254 F.3d at 1358. The Federal Circuit held that the plaintiff had standing to sue for correction of inventorship despite the lack of an expectation of ownership. *Id.* The court reasoned that the plaintiff had a "concrete financial interest in the patent" because of royalty payments, stock options, and payments from licensing agreements. *Id.* at 1359. The court also held that the deprivation of these benefits constituted an "injury in fact." Although Theis could, therefore, suffer an "injury in fact" as a result of losing royalty payments, his situation is distinguishable from *Chou* in a key respect. Without deciding whether the injury could be "fairly traceable" to defendant's conduct, Theis' standing argument fails because the court would not be able to redress his alleged injury. See *Lujan*, 504 U.S. at 560, 112 S.Ct. 2130. The "injury in fact" in this case centers around the payment of patent fees. Assuming that the court rendered a decision favorable to plaintiff, any illegal exaction would be returned to the parties that paid the patent fees. As distinguished from *Chou* where the redress entailed the correction of inventorship, the court would not be able to return the illegal exaction to both Illinois Technology Transfer and Theis. Therefore, any person who has not paid patent fees since August 8, 1995, does not have standing.

#### C. *Pleading an Illegal Exaction*

■ Defendant asserts that plaintiff has not pled an illegal exaction. To properly plead an illegal exaction, plaintiff must have alleged that he "paid money over to the government, directly or in effect, and seeks return of all or part of that sum ...." *East-*

*port*, 178 Ct.Cl. at 605, 372 F.2d 1002; *Aerolineas Argentinas v. United States*, 77 F.3d 1564, 1573 (Fed.Cir.1996) ("[A]n illegal exaction has occurred when 'the government has the citizen's money in its pocket.' Suit can then be maintained under the Tucker Act to recover the money exacted.") (quoting *Clapp v. United States*, 127 Ct.Cl. 505, 117 F.Supp. 576 (1954)).

■ In plaintiff's Amended Complaint, plaintiff alleged that he paid patent fees and that said fees were illegal because they exceeded constitutional limitations.[24] Plaintiff's request for relief also sought "the return of any diverted or rescinded patent fees ...."[25] Although plaintiff did not expressly use the term "illegal exaction" or "wrongful exaction" until its opposition to defendant's motion to dismiss, plaintiff's Amended Complaint contained "all the material elements necessary to sustain a recovery ...." *Herdrich v. Pegram*, 154 F.3d 362, 369 (7th Cir.1998). Accordingly, the court concludes that plaintiff pled an illegal exaction. See *Conley v. Gibson*, 355 U.S. 41, 48, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957) (explaining that pleading is not "a game of skill in which one misstep by counsel may be decisive to the outcome and ... that the purpose of pleading is to facilitate a proper decision on the merits").

#### D. *Patent Clause*

Plaintiff maintains that the court has jurisdiction over its Patent Clause claim because it seeks the return of an illegal exaction. Defendant does not dispute the court's jurisdiction over illegal exactions, but rather asserts that the Patent Clause "does not in any way confer a substantive right on any individual," *Tape Indus. Ass'n of Am. v. Younger*, 316 F.Supp. 340, 346 (C.D.Cal.1970), and does not mandate the payment of money.

■ Irrespective of the court's analysis concerning the Patent Clause's substantive limitations, the court has jurisdiction to hear claims for illegal or wrongful exactions. *Eastport*, 178 Ct.Cl. at 605, 372 F.2d 1002.

---

24. Amended Complaint ¶¶ 2, 5.

25. *Id.* at 10. In addition, plaintiff acknowledged at oral argument that the requested relief only sought "the return of the money to the Plaintiff,

and we respectfully submit that it may be beyond this Court's authority to order the return of the money to the patent office." Tr. at 47–48.

In the context of an illegal exaction, the court has jurisdiction regardless of whether the provision relied upon can be reasonably construed to contain money-mandating language. *Bowman,* 35 Fed.Cl. 397, 401 (1996) ("In illegal exaction cases, in contrast to other actions for money damages, jurisdiction exists even when the provision allegedly violated does not contain compensation mandating language."). Defendant's arguments, therefore, are rejected, and the court has jurisdiction over plaintiff's Patent Clause claim as an illegal exaction.

### E. *Direct Tax Clause*

■ Plaintiff contends that Congress' "increases, diversions, and rescissions" of patent fees constitute a direct tax in violation Article I, Section 9, Clause 4. Defendant maintains, as it did in regard to the Patent Clause, that the court lacks jurisdiction because the Direct Tax Clause does not mandate the payment of money.

As plaintiff made clear in response to the court's inquiry at oral argument, his Direct Tax Clause claim seeks the return of an illegal exaction.[26] The Federal Circuit has held that this court has jurisdiction "over [a] tax count, which seeks refund of a wrongful exaction." *Longshore,* 77 F.3d at 441 (citing *Testan,* 424 U.S. at 401–02, 96 S.Ct. 948); see also *Halliburton Co. ex rel. Halliburton v. United States,* 41 Fed.Cl. 272, 274–75 (1998) (explaining that the Court of Federal Claims has jurisdiction over illegal exactions). In this regard, defendant's argument that the court lacks jurisdiction because the Direct Tax Clause does not mandate the payment of money fails. *Bowman,* 35 Fed.Cl. at 401. The court, therefore, exercises jurisdiction over plaintiff's Direct Tax Clause claim as an illegal exaction.

### F. *Takings Claim*

Defendant contends that plaintiff's takings claim should be dismissed because allegations of unauthorized action cannot form the basis of a takings claim. Plaintiff asserts

that its takings claim was pled as "an alternative basis of recovery,"[27] and should be considered only if the court finds that Congress' actions were authorized.[28]

■ Defendant correctly points out that this court cannot exercise jurisdiction over a takings claim premised on unauthorized action. *Short v. United States,* 50 F.3d 994, 1000 (Fed.Cir.1995); *Tabb Lakes, Ltd. v. United States,* 10 F.3d 796, 802 (Fed.Cir. 1993); *Florida Rock Indus., Inc. v. United States,* 791 F.2d 893, 895–99 (Fed.Cir.1986), *cert. denied,* 479 U.S. 1053, 107 S.Ct. 926, 93 L.Ed.2d 978 (1987). Indeed, plaintiff "must concede the validity of the government action which is the basis of the taking claim to bring suit under the Tucker Act." *Tabb Lakes,* 10 F.3d at 802 (citing *Florida Rock,* 791 F.2d at 899); see also *Golder v. United States,* 15 Cl.Ct. 513, 518 (1988).

■ Although defendant correctly interprets takings law, defendant's argument overlooks the court's pleading rules. According to the rules of this court, plaintiff is permitted to plead inconsistent claims in the alternative. RCFC 8(a), (e). While plaintiff's complaint did not expressly delineate its takings claim as being advanced "in the alternative," the court will nevertheless construe plaintiff's takings claim as such. See RCFC 8(f). Plaintiff logically could not prevail on both its Patent Clause claim and its takings claim. For example, if the court holds that Congress exceeded the Patent Clause's grant of authority, Congress' actions would be unauthorized and plaintiff's takings claim would fail on that basis. On the other hand, if the court holds that Congress' actions did not violate the Patent Clause, Congress' actions would have been authorized and although plaintiff would not be able to prevail on that count, plaintiff would be able to proceed under its takings claim. The fact that the validity of Congress' action is still in dispute, therefore, does not warrant dismissal of plaintiff's takings claim on jurisdictional grounds.

---

**26.** Tr. at 45 (explaining that the Direct Tax Clause claim is "properly classified as an illegal exaction").

**27.** Pl.'s Opp'n at 34.

**28.** *Id.* at 34–35 n. 12.

## II. Failure to State a Claim Upon Which Relief Can Be Granted

The court will grant a RCFC 12(b)(6) motion only if it appears beyond a doubt that plaintiff has failed to allege facts sufficient to support his claim. *Conley,* 355 U.S. at 45–46, 78 S.Ct. 99; *Mostowy v. United States,* 966 F.2d 668, 672 (Fed.Cir.1992). In ruling on a RCFC 12(b)(6) motion to dismiss, the court must accept as true the complaint's undisputed factual allegations and should construe them in a light most favorable to plaintiff. *Papasan v. Allain,* 478 U.S. 265, 283, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986) (citing *Scheuer,* 416 U.S. at 236, 94 S.Ct. 1683; *Gould, Inc. v. United States,* 935 F.2d 1271, 1274 (Fed.Cir.1991)). Nevertheless, "conclusory allegations unsupported by any factual assertions will not withstand a motion to dismiss." *Briscoe v. LaHue,* 663 F.2d 713, 723 (7th Cir.1981), *aff'd,* 460 U.S. 325, 103 S.Ct. 1108, 75 L.Ed.2d 96 (1983). "[L]egal conclusions, deductions, or opinions couched as factual allegations are not given a presumption of truthfulness." *Blaze Constr., Inc. v. United States,* 27 Fed.Cl. 646, 650 (1993) (internal quotations omitted).

### A. *Patent Clause*

Plaintiff asserts that the "increases, diversions, and rescissions" of patent fees exceed Congress' authority "[t]o promote the Progress of ... useful Arts." Defendant avers that it is beyond the court's power to review the level at which the patent fees were set as well as the manner in which Congress appropriates the fees. Defendant, relying on *Tape Industries,* also contends that the Patent Clause "does not in any way confer a substantive right on any individual." *Tape Indus.,* 316 F.Supp. at 346. Further, defendant maintains that plaintiff's Patent Clause claim is based solely on the clause's "preamble," which the United States Court of Appeals for the District of Columbia (D.C.Circuit) held is not a substantive limit on Congress' power. *Eldred v. Reno,* 239 F.3d 372, 377–78 (D.C.Cir.2001). Defendant also asserts that a diversion has not occurred and that there has been no net rescission of funds.

As an initial matter, defendant asserts that the Federal Circuit has unequivocally established that it is for Congress, not the courts, to determine "[t]he level at which the fee was to be set, and why, and where the excess over costs should go ...." *Longshore,* 77 F.3d at 443. In *Longshore,* Congress enacted legislation requiring the Federal Communications Commission (FCC) to utilize a lottery-type system when awarding a cellular radio systems license. *Id.* at 441. An applicant seeking the license was required to submit a $200 application fee along with the application. *Id.* The application fee exceeded the FCC's actual administrative costs by $180 and the excess sums were deposited into a general account at the United States Treasury. *Id.* at 442. The plaintiff in *Longshore* argued that the allegedly excessive fee constituted a taking in violation of the Fifth Amendment and constituted an usurpation of Congress' taxing power under Article 1, Section 8, Clause 1 of the Constitution. *Id.* The Federal Circuit rejected the plaintiff's argument and dismissed both counts for failure to state a claim upon which relief can be granted. *Id.* at 445. The Federal Circuit reasoned that absent an allegation of a constitutional breach, the court should not interfere with Congress' management of executive branch agencies. *Id.* at 444.

Defendant's reading of *Longshore* overlooks the instances where the Federal Circuit made clear that the plaintiff was not alleging a constitutional violation. *Id.* at 443 ("[Plaintiff] does not claim that Congress has exceeded its constitutional authority to control and regulate access to the spectrum."); see also *id.* at 444 n. 3 ("We note again that appellant has not based his challenge on any purported overstepping of Congress' constitutional authority ...."). The Federal Circuit also qualified its reasoning in the following manner: "Even if we were to assume that Congress acted foolishly, or mistakenly, or ignorantly, that is a matter that only Congress can correct, *absent some clear breach of its constitutional power." Id.* at 444 (emphasis added). Contrary to defendant's assertion, the Federal Circuit has not foreclosed review of Congress' actions in the realm of agency administration. Rather, as can be gleaned from *Longshore,* the court is permitted to

review Congress' actions to ascertain their constitutionality. As distinguished from the plaintiffs' in *Longshore*, plaintiff has alleged that Congress exceeded the limitations set forth in the Constitution. Congress' actions in this case are, therefore, not immune from judicial review.

 Defendant next argues that "the Supreme Court ... has made it absolutely clear that the [Patent Clause] merely empowers Congress to enact legislation and does not in any way confer a substantive right on any individual." *Tape Indus.*, 316 F.Supp. at 346 (citations omitted). Plaintiff's Patent Clause claim, however, is subtly distinct from *Tape Industries* and the cases referenced therein. Plaintiff is not alleging that the Patent Clause confers any sort of substantive right upon him. Rather, as the petitioners in *Eldred*, plaintiff is asserting that Congress exceeded its constitutional authority under the Patent Clause. See *Eldred*, 123 S.Ct. at 775 ("[Petitioners] seek a determination that the CTEA fails constitutional review ...."). For that matter, if the Patent Clause truly did not provide any basis for redress from alleged unconstitutional congressional action, the Supreme Court would simply have dismissed the complaint in *Eldred* on that ground. As defendant is well aware, however, that was not the reasoning advanced by the Supreme Court.

The inquiry, therefore, turns to the text of the Patent Clause which provides that "Congress shall have power ... [t]o promote the Progress of ... useful Arts, by securing for limited Times to ... Inventors the exclusive right to their ... Discoveries." U.S. CONST. art. I, § 8, cl. 8. Although "there was no recorded debate in the Constitutional Convention ... when the proposed copyright clause was presented," [29] the court's research reveals a diverse range of opinions regarding the clause's proper construction. Compare *Eldred v. Reno*, 239 F.3d 372 (D.C.Cir.2001), *aff'd*, 537 U.S. 186, 123 S.Ct. 769, 154 L.Ed.2d 683 (2003), *Hutchinson Tel. Co. v. Fronteer Directory Co. of Minn.*, 770 F.2d 128 (8th Cir.1985), *Schnapper v. Foley*, 667 F.2d 102 (D.C.Cir.1981), *Tape Indus. Ass'n of Am. v. Younger*, 316 F.Supp. 340, 346 (C.D.Cal.1970), *Ladd v. Law & Tech. Press*, 762 F.2d 809, 812 (9th Cir.1985), with *Brenner v. Manson*, 383 U.S. 519, 528–29, 86 S.Ct. 1033, 16 L.Ed.2d 69 (1966), *Stiftung v. Renishaw*, 945 F.2d 1173, 1180 (Fed.Cir.1991), *Mitchell Bros. Film Group v. Cinema Adult Theater*, 604 F.2d 852 (5th Cir.1979), *Frantz Mfg. Co. v. Phenix Mfg. Co.*, 457 F.2d 314 (7th Cir.1972), *Aalmuhammed v. Lee*, 202 F.3d 1227 (9th Cir.2000), *Rosemont Enters., Inc. v. Random House, Inc.*, 366 F.2d 303 (2d Cir.1966), and *Greenberg v. Nat'l Geographic Soc'y*, 244 F.3d 1267 (11th Cir.2001).[30]

The court begins with the proposition enunciated two hundred years ago by Chief Justice Marshall in *Marbury v. Madison*: "[i]t cannot be presumed that any clause in the constitution is intended to be without effect ...." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 174, 2 L.Ed. 60 (1803). The Supreme Court recently reaffirmed this principle in *United States v. Morrison*, stating that "the powers of the legislature are defined, and limited; and that those limits may not be mistaken, or forgotten, the constitution is written." *United States v. Morrison*, 529 U.S. 598, 607, 120 S.Ct. 1740, 146 L.Ed.2d 658 (2000) (citing *Marbury*, 5 U.S. at 176). The import of these statements leads to the inevitable conclusion that Congress' power in the area of patents derives from the very language the founding fathers incorporated into the text of the Patent Clause. *Aalmuhammed*, 202 F.3d at 1235; *Greenberg*, 244 F.3d at 1271 ("The copyright clause, consisting of twenty-four words crafted by our founding fathers, is the Rosetta Stone for all statutory interpretation and analysis."). As with any enumerated power, this grant of power is not limitless; rather, even at its broadest construct, there is a necessity that some "outer limit" be imposed. *Eldred*, 239 F.3d at 381 (Sentelle, J., dissenting); see also *United States v. Lopez*, 514 U.S. 549, 556–57, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995) ("[C]ongressional power under the

---

**29.** Irah Dohner, *The Copyright Clause of the U.S. Constitution: Why Did the Framers Include It with Unanimous Approval?*, 36 AM J. LEGAL HIST. 361, 361 (1992).

**30.** See also MELVILLE B. NIMMER & DAVID NIMMER, NIMMER ON COPYRIGHTS § 1.03 (2002).

Commerce Clause ... is subject to outer limits.").

The Supreme Court has on numerous occasions commented about the proper scope and interpretation of the Patent Clause. The Supreme Court has held that the Patent Clause constitutes both "a grant of power and a limitation." *Graham v. John Deere Co. of Kansas City*, 383 U.S. 1, 5, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966). The Supreme Court has also characterized Congress' power under the Patent Clause as a "qualified authority ... limited to the promotion of advances in the 'useful arts.'" *Id.* In the context of copyrights, the Supreme Court has recognized that "[t]he 'constitutional command' ... is that Congress, to the extent it enacts copyright laws at all, create a 'system' that 'promote[s] the Progress of Science.'" *Eldred*, 123 S.Ct. at 783 (citing *Feist Publ'n, Inc. v. Rural Tel. Serv. Co., Inc.*, 499 U.S. 340, 349, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991)). In addition, the Supreme Court has stated that Congress' "primary objective" must be "[t]o promote the Progress of Science." *Id.*, 123 S.Ct. at 784–85 (citing *Feist*, 499 U.S. at 349, 111 S.Ct. 1282). It is, therefore, "[w]ithin the scope established by the Constitution, [that] Congress may set out conditions and tests for patentability." *Graham*, 383 U.S. at 6, 86 S.Ct. 684 (citing *McClurg v. Kingsland*, 42 U.S. (1 How.) 202, 206, 11 L.Ed. 102 (1843)); *Law & Tech. Press*, 762 F.2d at 813 (interpreting *Graham* to stand for the proposition that conditions must adhere to the constitutional grant of power).

Relying on *Schnapper* and *Eldred*, however, defendant asserts "that the preamble of the Copyright Clause is not a substantive limit on Congress' legislative power." *Eldred*, 239 F.3d at 378 (citing *Schnapper*, 667 F.2d at 112). Defendant also maintains that the Supreme Court left appellate precedent undisturbed by declining to address whether the "preambular '[t]o promote' language of Article I's Copyrights and Patents Clause to be an independently enforceable substantive limitation upon Congress."[31] As set forth below, the court must reject defendant's argument that the introductory language of the Patent Clause is not a substantive limit on Congress' power.

By declining to expressly address whether Congress' power is independently limited by the phrase "to promote the Progress of ... useful Arts," the Supreme Court did indeed leave the D.C. Circuit decisions in *Schnapper* and *Eldred* undisturbed. The true import of defendant's argument, however, is that all appellate precedent was left undisturbed by the Supreme Court's refusal. Although the holdings of the decision rendered by the D.C. Circuit remain intact, cases from the Federal Circuit shedding light on the issue likewise retain their viability. The cases from the two circuits may conflict, but that is immaterial; the Federal Circuit, not the D.C. Circuit, guides the court's inquiry. Further, any discrepancy between the two circuits must heed to the Supreme Court's decision in *Brenner*.

The Federal Circuit has held that the utility requirement of 35 U.S.C. § 101 derives from the introductory language of the Patent Clause. *Stiftung*, 945 F.2d at 1180 ("The utility requirement has its origin in article I, section eight of the Constitution, which indicates that the purpose of empowering Congress to authorize the granting of patents is 'to promote progress of ... *useful* Arts.'" (emphasis in original)).[32] The Federal Circuit cited the Supreme Court's decision in *Brenner* which provided that "[o]ur starting point is the proposition, neither disputed nor disputable, that one may only patent that which is 'useful.'" *Brenner*, 383 U.S. at 528–29, 86 S.Ct. 1033; see also *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 171, 6 L.Ed. 23 (1824) ("The law of Congress declares, that all inventors of useful improvements throughout the United States, shall be entitled to the exclusive right in their discoveries ...."). The "usefulness" requirement, therefore, derives directly from the clause's "preamble."

31. Defendant's Memorandum Regarding The United States Supreme Court's Decision In Eldred v. Ashcroft at 1.

32. See also 1 E. Lipscomb, *Lipscomb's Walker on Patents* § 5.1, at 476 (3d ed.1984); 1 D. Chisum, *Patents* § 101, at 1–7 to 1–8 & n. 12 (2003).

The court will not entertain arguments that the clause's language should be parsed even further to give meaning to the term "useful" but to deny any substantive meaning to the phrase "to promote the progress of . . . ." With the debate having delved this deeply, it is important to remember basic principles of statutory construction that direct the court to construe a provision in a manner which gives meaning and effect to "every clause and word of a statute." *Williams v. Taylor*, 529 U.S. 362, 404, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000); see also *W & F Bldg. Maint. Co. v. United States*, 56 Fed.Cl. 62, 69 (2003). If the court accepted defendant's argument, the court would render a segment of the Patent Clause meaningless; a segment containing a term which the Supreme Court and the Federal Circuit have previously defined. The court is bound by *Stiftung* and *Brenner* and defendant's argument, therefore, fails.

In this regard, the court also finds the Supreme Court's analysis in *Eldred* instructive. In *Eldred*, the petitioners conceded that the "preamble" of the Patent Clause did not constitute a limit on congressional power. *Eldred*, 239 F.3d at 377–78.[33] The crux of petitioner's argument, however, was that "limited times" should be analyzed in relation to the Patent Clause's introductory language. *Id*. When rejecting petitioner's claim, the D.C. Circuit explained that "one cannot concede that the preamble 'is not a substantive limit' and yet maintain that it limits the permissible duration of a copyright more strictly than does the textual requirement that it be for a 'limited time.'" *Id*. On writ of certiorari, however, the Supreme Court analyzed the impact of the Copyright Term Extension Act (CTEA) in relation to the introductory language of the Patent Clause. *Eldred*, 123 S.Ct. at 784–86 ("The justifications . . . provide a rational basis for the conclusion that the CTEA 'promote[s] the

Progress of Science.'"). The D.C. Circuit's conclusion that the clause's "preamble" contains no limitation whatsoever is at odds with the Supreme Court's analysis in *Eldred*. If the introductory language lacked any substantive limitation, the Supreme Court would not have engaged in what would have been deemed extraneous and unnecessary analysis.

Perhaps envisioning that the court would be apprehensive about rendering a segment of the Patent Clause meaningless, defendant asserts that the introductory language of the Patent Clause is nevertheless inapplicable to patent fees. The court is well-aware that Congress has the power to condition the grant of a patent on the payment of patent fees. *Giuliani v. United States*, 8 U.S.P.Q.2d 1095, 1095, 1988 WL 97455 (D.Haw.1988) (citing *Boyden v. Comm'r of Patents*, 441 F.2d 1041, 1043 (D.C.Cir.1971)), aff'd, 878 F.2d 1444 (Fed.Cir.1989). Defendant maintains that "[n]o person has a vested right to a patent . . . but is privileged to seek the protected monopoly only upon compliance with conditions Congress has imposed." *Boyden*, 441 F.2d at 1043 (citing *McClurg*, 42 U.S. at 202); *Mast, Foos & Co. v. Stover Mfg. Co.*, 177 U.S. 485, 494, 20 S.Ct. 708, 44 L.Ed. 856 (1900) ("Congress having created the monopoly, may put such limitations upon it as it pleases."). Conversely, plaintiff contends that patent fees must be limited to that which is necessary and "essential to the effective working of the patent system." *Boyden*, 441 F.2d at 1044.[34]

Congress is empowered "t[o] make all Laws which shall be necessary and proper for carrying into Execution" its enumerated Article I powers. U.S. CONST. art. I, § 8, cl. 18. Congress has not exceeded its power where the means it adopts are "appropriate" and "plainly adapted" to achieving a constitutional end. *M'Culloch v. Maryland*, 17 U.S.

---

**33.** It appears that the petitioners in *Eldred* had no option but to concede this issue. Once *Schnapper* was "on the books," the D.C. Circuit was "bound by its holding unless and until that holding [was] changed by [an *en banc* panel] or by the higher authority of the Supreme Court." *Eldred*, 239 F.3d at 382 (Sentelle, J., dissenting) (citing *LaShawn A. v. Barry*, 87 F.3d 1389, 1395 (D.C.Cir.1996)).

**34.** The full text of the D.C. Circuit's statement reads as follows: "Congress has granted a privilege, open to all, and has created no requirements which can be said to be unnecessary to what Congress in the exercise of its plenary power deems essential to the effective working of the patent system." *Boyden*, 441 F.2d at 1044.

(4 Wheat.) 316, 421 (1819). In exercising its power under the Patent Clause, Congress may enact laws that are "necessary and proper" to achieving the constitutional end of "promot[ing] the Progress of ... useful Arts." *Mitchell Bros.*, 604 F.2d at 860. It is under this standard that the United States Court of Appeals for the Fifth Circuit upheld Congress' decision to permit writings to be copyrighted without regard to their content. *Id.* at 858–60. Further, although the United States Court of Appeals for the Ninth Circuit did not find a limit to Congress' power in the Patent Clause, it nevertheless analyzed whether requiring a copyright holder to deposit two copies of its publication with the Library of Congress as a condition to obtaining a patent was necessary and proper. *Law & Tech. Press*, 762 F.2d at 812. When Congress enacts legislation that "increases, diverts, or rescinds" patent fees, it purports to exercise its power under the Necessary and Proper clause. As indicated in *Mitchell Bros.* and *Law & Technology Press*, Congress' actions may be reviewed. The court sees no reason to exclude the imposition of surcharges, as a condition to obtaining a patent,[35] from Congress' constitutional mandate. See *Graham*, 383 U.S. at 6, 86 S.Ct. 684 (citing *McClurg*, 42 U.S. at 206); *Law & Tech. Press*, 762 F.2d at 813. If the conditions which Congress imposed did not comport with its constitutional command, the purpose of the clause could be thwarted by merely framing any requirement as a condition. Further, the alleged implementation of a process by which patent fees are "increased, diverted or rescinded" without regard to, or in contravention of, constitutional authority warrants judicial review. See *Longshore*, 77 F.3d at 443–45. In sum, defendant has not convincingly explained how the increased patent fees and the "diversion or rescission" of patent fees do not fall within the "system" that must "promote the Progress of ... useful Arts." See *Eldred*, 123 S.Ct. at 783 (citing *Feist*, 499 U.S. at 349, 111

S.Ct. 1282). Plaintiff has, therefore, stated a claim upon which relief can be granted.

That is not to say that what Congress has done here conclusively exceeds its power under the Patent Clause and constitutes an illegal exaction. "Within the limits of [its] constitutional grant, the Congress may, of course, implement the stated purpose of the Framers by selecting the policy which in its judgment best effectuates the constitutional aim." *Graham*, 383 U.S. at 6, 86 S.Ct. 684. Accordingly, the court's subsequent review of Congress actions will be governed by substantial deference. *Eldred*, 123 S.Ct. at 783; *Law & Tech. Press*, 762 F.2d at 812; *Mitchell Bros.*, 604 F.2d at 860 ("[T]he court's role in judging whether Congress has exceeded its Article I power is limited."). The court's role will, therefore, be limited to discerning if Congress' legislation "increasing, diverting, and rescinding" patent fees was necessary and proper to achieving its constitutional end of "promot[ing] the Progress of ... useful Arts."

Lastly, defendant asserts that there has been neither a "diversion" of patent fees nor a "net rescission [of patent fees] to the General Treasury."[36] Specifically, defendant maintains that plaintiff cannot point to any appropriations that authorize another agency to expend the funds credited to the PTO. Plaintiff has, however, at the very least directed the court's attention to the increased level of patent fees. Further, plaintiff's allegations appear to entail more than a simple "diversion and rescission followed by an appropriation" construct. Rather, plaintiff is asserting that funds are not appropriated to the PTO in order that the equivalent of those funds may be spent on unrelated government programs. By withholding the funds from the PTO in a given year, Congress is thereby permitted to appropriate the amount not expended by the PTO to other government programs. And all that awaits, therefore, is a formal rescission, which defendant has already conceded occurred. In this model, an appropriation of the funds credited to the

**35.** During oral argument, and in its briefs, defendant repeatedly indicated that the fee was "a condition of the patent privilege." Tr. at 14, 15, 21, 23–24, 76; Def.'s Mot. to Dismiss at 33, 38, 40.

**36.** Def.'s Reply at 4.

PTO is not required. Although these issues will require further ventilation, they are sufficient to withstand a motion to dismiss.

## B. *Direct Tax Clause*

Plaintiff asserts that the "increases, diversions, and rescissions" of patent fees constitute an unlawful direct tax on its intellectual property. Defendant, on the other hand, urges the court to adopt the reasoning of *Longshore* and hold that the patent fees are not a tax, but rather a condition of applying for the patent privilege. In this regard, defendant avers that plaintiff has no intellectual property right apart from satisfying statutorily imposed conditions and, therefore, there was no privately owned asset that could be taxed. Plaintiff maintains that it owns its inventions under state trade secret laws and that a patent application constitutes property.[37] Defendant also asserts that if the patent fees are found to be a tax, the tax nevertheless more closely resembles an excise tax than a direct tax.

■ "[T]he Constitution recognizes the two great classes of direct and indirect taxes, and lays down two rules by which their imposition must be governed, namely: The rule of apportionment as to direct taxes, and the rule of uniformity as to duties, imposts and excises." *Pollock v. Farmers' Loan and Trust Co.*, 157 U.S. 429, 557–58, 15 S.Ct. 673, 39 L.Ed. 759 (1895). The Direct Tax Clause provides that "No Capitation, or other direct, Tax shall be laid, unless in Proportion to the Census or Enumeration herein before directed to be taken." U.S. CONST. art. I, § 9, cl. 4. The method of apportionment is determined by Article I, Section 2 of the Constitution. U.S. CONST. art. I, § 2. "A direct tax is a tax on real or personal property, imposed solely by reason of its being owned by the tax payer." *Simmons v. United States*, 308 F.2d 160, 166 (4th Cir.1962); *NationsBank of Texas v. United States*, 269 F.3d 1332, 1335 (Fed.Cir.2001) ("A tax is direct if levied directly upon property ...."). The burden of persuasion rests with the party alleging the existence of a direct tax. *First Nat. Bank in*

*Dallas v. United States*, 190 Ct.Cl. 400, 413, 420 F.2d 725 (1970).

■ Plaintiff correctly avers that it owns its invention under state trade secret laws. *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1000–04, 104 S.Ct. 2862, 81 L.Ed.2d 815 (1984) (recognizing the "property-like nature" of trade secrets); See *Group One, Ltd., v. Hallmark Cards, Inc.*, 254 F.3d 1041, 1050 (Fed.Cir.2001). Plaintiff also correctly maintains that a patent application constitutes property. See 37 C.F.R. § 1.21 (enumerating the fee associated with "recording each assignment, agreement or other paper relating to the property in a patent or application"). Ownership of an invention under state trade secret law, or ownership of a patent application, does not change the fact that plaintiff does not have a preexisting property right in a patent independent of payment of the patent fees. See *McClurg*, 42 U.S. at 206; Cf. *Longshore*, 77 F.3d at 444–45 (holding that the fee to participate in a lottery for a cellular radio system license was not a tax because there was no privately owned asset to tax). Plaintiff's property interest in a patent accrues only after it has satisfied all mandatory conditions. Prior to that occurrence, plaintiff does not have a recognizable property interest that can be taxed.

■ In an attempt to overcome the lack of a recognizable property interest, plaintiff contends that the maintenance fees independently constitute a direct tax on its personal property. Specifically, plaintiff avers that the maintenance fees are a direct tax because they are "required even where the inventor does not license, use or otherwise practice the patented invention."[38] Defendant reiterates its argument that maintenance fees are a condition which plaintiff must satisfy to sustain the privilege of a patent. The court agrees with defendant. As a condition of granting the patent privilege for the full twenty-year term, plaintiff is required to periodically pay maintenance fees.[39] If these maintenance fees are not paid, it is not that

---

**37.** Tr. at 66–67, 84–86.

**38.** Pl.'s Reply at 19.

**39.** 37 C.F.R. §§ 1.20(e)-(i).

plaintiff's personal property is taken away, or for that matter taxed, but rather the conditions of the privilege are no longer satisfied. See 35 U.S.C. § 154(a)(2) (explaining that the term of a patent is contingent upon the payment of fees). Therefore, as to his Direct Tax Clause claim, plaintiff has failed to state a claim upon which relief can be granted.

## C. *Takings Claim*

The court next addresses, under the assumption that Congress' actions were authorized, plaintiff's assertion that the "increases, diversions, and rescissions" of patent fees constitutes a taking without just compensation.[40] Defendant contends that "the Takings Clause does not apply to legislation requiring the payment of money." *Commonwealth Edison Co. v. United States,* 271 F.3d 1327, 1329 (Fed.Cir.2001) (citing *Eastern Enters. v. Apfel,* 524 U.S. 498, 118 S.Ct. 2131, 141 L.Ed.2d 451 (1998)). Defendant, again relying on *Longshore,* also avers that the patent fees are a condition of applying for the patent privilege, and plaintiff does not have a property right that may be taken.

The Fifth Amendment of the Constitution states that "private property" shall not "be taken for public use, without just compensation." U.S. CONST. amend. V. In takings jurisprudence, it is firmly established that certain government regulations can constitute a taking of property requiring just compensation. *Penn Cent. Transp. Co. v. City of New York,* 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978); *Lucas v. S. Carolina Coastal Council,* 505 U.S. 1003, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992). This proposition is not strictly limited to real property, but rather "[i]t is also clear that a fund of money can be property protected under the Takings Clause." *Edison,* 271 F.3d at 1338; see also *Phillips v. Washington Legal Found.,* 524 U.S. 156, 160, 118 S.Ct. 1925, 141 L.Ed.2d 174 (1998); *Webb's Fabulous Pharmacies, Inc. v. Beckwith,* 449 U.S. 155, 164–65, 101 S.Ct. 446, 66 L.Ed.2d 358 (1980).

The Federal Circuit has made it clear that "[t]he definitive issue with respect to ... [a] takings claim ... is whether [the plaintiff] had a property interest that was taken from him by government action." *Longshore,* 77 F.3d at 443. As was discussed in the resolution of plaintiff's Direct Tax claim, the principle that plaintiff does not have an independent property interest apart from satisfying all conditions imposed by Congress is equally applicable to plaintiff's takings claim. Plaintiff's takings claim, therefore, rests on his allegations that the voluntary payment of increased patent fees, and the subsequent diversion or rescission of those fees, constitutes a taking. Although a fund of money may be protected, "the mere imposition of an obligation to pay money ... does not give rise to a claim under the Takings Clause of the Fifth Amendment." *Edison Co.,* 271 F.3d at 1340; see *Atlas Corp. v. United States,* 895 F.2d 745, 756 (Fed.Cir. 1990) ("Requiring money to be spent is not a taking of property.") (citing *United States v. Sperry Corp.,* 493 U.S. 52, 62, 110 S.Ct. 387, 107 L.Ed.2d 290 (1989)). In *Sperry Corp.,* the Supreme Court rejected the argument that the government's fee constituted a physical appropriation of property. The Court made clear that "[u]nlike real or personal property, money is fungible." *Sperry Corp.,* 493 U.S. at 62 n. 9, 110 S.Ct. 387. As the case law makes clear, takings law offers plaintiff no reprieve. *Longshore,* 77 F.3d at 443–45 (holding that the payment of fees as a prerequisite to participating in a lottery for a radio cellular systems license was not a taking).

Plaintiff, however, shifts gears and also asserts that the PTO held patent fees in trust, "constructive or otherwise," [41] on their behalf and that the alleged diversion and rescission of patent fees independently constitutes a taking. See *Phillips,* 524 U.S. at 160, 118 S.Ct. 1925; *Webb's,* 449 U.S. at 164–65, 101 S.Ct. 446. Defendant contends that the trust fund to which plaintiff refers is actually a Customer Deposit Account (CDA),

---

40. At oral argument, plaintiff indicated that its takings claim and Direct Tax Clause claim are not dependent on the resolution of its Patent Clause claim. Tr. at 32.

41. Pl.'s Reply at 10.

which is a separate account from "ordinary" patent application fees, and that plaintiff has not deposited any money into that particular account. Plaintiff appears to maintain that its takings claim is based on both the Cumulative Result of Operations (CRO) and CDA.[42] Defendant avers that the CRO is simply a calculation of the "cumulative unrestricted net operating gain recognized by the PTO since its inception"[43] and cannot be characterized as a trust account.

Before examining the parties' arguments, the court notes that plaintiff relies on an appendix submitted with his Opposition To Defendant's Motion To Dismiss to support his trust argument. Defendant also relies on plaintiff's appendix in supporting its position. RCFC 12(b) provides that a motion to dismiss for failure to state a claim shall be treated as a motion for summary judgment under RCFC 56 if "matters outside the pleading are presented to and not excluded by the court." RCFC 12(b); *Rockefeller Ctr. Props. v. United States*, 32 Fed.Cl. 586, 589 n. 6 (1995). Since the parties clearly rely on more than just the pleadings for their trust arguments, the court will analyze this aspect of defendant's motion to dismiss under the summary judgment standard.

Plaintiff correctly recognizes that *Webb's* and *Phillips* hold that a fund can be protected under the Fifth Amendment. *Webb's*, 449 U.S. at 164–65, 101 S.Ct. 446; *Phillips*, 524 U.S. at 160, 118 S.Ct. 1925. In *Webb's*, the Supreme Court held that interest taken from private funds deposited with a court in an interpleader action was a taking of private property. *Webb's*, 449 U.S. at 164–65, 101 S.Ct. 446. In *Phillips*, the Supreme Court held that the interest generated by funds held in Interest on Lawyers Trust Accounts (IOLTA) is the private property of the owner of the principal. *Phillips*, 524 U.S. at 172, 118 S.Ct. 1925. Plaintiff, however, seeks to expand the holdings of *Webb's* and *Phillips* far beyond that which was contemplated by

the Supreme Court. *Webb's*, 449 U.S. at 164, 101 S.Ct. 446 (explaining that the Court's holding was limited to "the narrow circumstances of this case").

In *Webb's* and *Phillips*, the Court gave significant weight to the fact that the principal held in the accounts was private property of the owner. *Webb's*, 449 U.S. at 160, 101 S.Ct. 446 ("The principal sum deposited in the registry of the court plainly was private property . . . ."); *Phillips*, 524 U.S. at 164, 118 S.Ct. 1925 ("All agree that . . . the principal held in the IOLTA trust account was the 'private property' of the client."). In *Phillips*, the Court noted that the money "remain[ed] in the control of the private attorney and [was] freely available to the client upon demand." *Phillips*, 524 U.S. at 164, 118 S.Ct. 1925. Conversely, in our case, the fees were neither in the control of plaintiff, or his representative, after they were deposited with the PTO, nor were they available to plaintiff, or his representative, upon demand. See *id.*; see also 35 U.S.C. § 42(b) (explaining that patent fees are credited to the PTO). Therefore, plaintiff did not possess any of the rights traditionally associated with ownership, see *Phillips*, 524 U.S. at 169–70, 118 S.Ct. 1925, and did not have any property right in the distribution of the proceeds. *Webb's*, 449 U.S. at 161, 101 S.Ct. 446.

Although *Webb's* and *Phillips* protect the principal and interest of private funds, plaintiff paid the patent fees as a condition of applying for a patent and the PTO was not holding the patent fees in trust on plaintiff's behalf. The CDA contains funds paid by customers "in anticipation of a future demand for services."[44] These are the only funds that are held in "trust for the PTO's customers."[45] Plaintiff did not deposit any funds into the CDA account, and nevertheless, it does not appear that any funds were diverted or rescinded from that particular account.[46] On the other hand, the portion of

---

42. *Id.* at 11.

43. Pl.'s Opp'n, Appendix (App.) at 19.

44. *Id.*, App. at 17.

45. *Id.*, App. at 15. Compare *id.*, App. at 15 (noting that "$46.2 million represented moneys

held in trust for PTO's customers" at the conclusion of fiscal year 1997) with *id.*, App. at 18 (explaining that the liability for CDAs at the end of fiscal year 1997 was $46.2 million).

46. Pl.'s Reply at 11; Pl.'s Opp'n, App. at 17.

the PTO Performance and Accountability Report Fiscal Year 2000 cited to by plaintiff does not support the proposition that the CRO is an account which holds patent fees in trust on plaintiff's behalf. There is, therefore, no genuine issue of material fact and defendant is entitled to judgment as a matter of law on this issue. The Constitution protects rather than creates property interests, see *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972), and the court will not expand takings law to encompass constructive trusts over non-private funds.

### Conclusion

For the above-stated reasons, defendant's motion to dismiss plaintiff's claims concerning the "increases, diversions, and rescissions" of patent fees is DENIED–IN–PART and GRANTED–IN–PART. Plaintiff's claim is limited to the six years prior to the date of the complaint. Any person who did not pay patent fees does not have standing to challenge the "increases, diversions, and rescissions" of patent fees. Paul Theis is therefore DISMISSED from the action. Defendant's motion to dismiss for lack of subject matter jurisdiction is DENIED. Defendant's motion to dismiss plaintiff's Patent Clause claim, as an illegal exaction, for failure to state a claim is DENIED. Defendant's motion to dismiss plaintiff's Direct Tax claim for failure to state a claim is GRANTED. Defendant's motion to dismiss plaintiff's takings claim, concerning the payment of patent fees, for failure to state a claim is GRANTED. With respect to plaintiff's trust argument, the court treated the motion as one for summary judgment because the parties relied on more than just the pleadings. Defendant's motion for summary judgment regarding plaintiff's trust argument is GRANTED. The parties are directed to file a joint status report indicating further proceedings by Friday, September 26, 2003.

IT IS SO ORDERED.